No. 23-3235

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

BRIAN CALVERT, ET AL.,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMIARLY SITUATED,
*Appellants,*

*v.*

BPS DIRECT LLC, ET AL.,

*Appellees.*

————————

Appeal from the United States District Court, Eastern District of
Pennsylvania, Case No. 2:23-md-03074
The Honorable Mark Kearney

## APPELLEES' BRIEF

Michael Rayfield
SHOOK, HARDY & BACON LLP
1 Rockefeller Plaza
Suite 2801
New York, NY 10020
(212) 989-8844
mrayfield@shb.com

Jennifer McLoone
SHOOK, HARDY & BACON LLP
201 South Biscayne Blvd.
Suite 3200
Miami, Fl 33131
(305) 358-5171
jmcloone@shb.com

Maveric Ray Searle
SHOOK, HARDY & BACON LLP
111 S. Wacker Drive
Suite 4700
Chicago, IL 60606
(312) 704-7700
msearle@shb.com

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

STATEMENT OF THE CASE ...............................................................3

    A.    BPS Uses Session Replay To Improve The Customer Experience On Its Websites....................................................3

    B.    The Plaintiffs Bring This Lawsuit Without Identifying Any Specific Data That They Allegedly Sent To BPS. .........4

    C.    The District Court Dismisses The Complaint For Lack Of Article III Standing. ................................................7

STANDARD OF REVIEW....................................................................10

SUMMARY OF ARGUMENT ..............................................................10

ARGUMENT .....................................................................................12

I.    The Plaintiffs Had To Allege That They Suffered A Harm Closely Related To The Kind Recognized At Common Law.........12

    A.    The Supreme Court's Cases Required A Comparative Analysis Of The Specific Information That The Plaintiffs Allegedly Disclosed. ...............................................12

    B.    This Court's Cases Required The Plaintiffs To Allege A Disclosure Of "Private Information." ...............................17

II.    The District Court Correctly Held That The Plaintiffs Did Not Allege Any Concrete Harm. ...................................................22

    A.    No Common Law Tort Is Remotely Analogous To The Disclosure Of Plaintiffs' Session Replay Data....................22

    B.    Courts Nationwide Have Overwhelmingly Reached The Same Conclusion As The District Court............................27

CONCLUSION .................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Arndt v. Gov't Emps. Ins. Co.*,
   2024 WL 4335644 (D. Md. Sept. 26, 2024) ........................................ 30

*Barclift v. Keystone Credit Servs., LLC*,
   93 F.4th 136 (3d Cir. 2024) .................... 2, 11, 17, 18, 19, 21, 25, 26, 27

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ........................................................... 16, 17

*In re BPS Direct, LLC*,
   705 F. Supp. 23d 333, 356 (E.D. Pa. 2023) ..................................... 28

*Common Cause of Pa. v. Pennsylvania*,
   558 F.3d 249 (3d Cir. 2009) .................................................... 10

*Cook v. Gamestop*,
   689 F. Supp. 3d 58 (W.D. Pa. 2023) ..................................... 24, 25, 29

*Daghaly v. Bloomingdales.com, LLC*,
   2024 WL 5134350 (9th Cir. Dec. 17, 2024) ..................................... 29

*DiNaples v. MRS BPO, LLC*,
   934 F.3d 275 (3d Cir. 2019) .................................................. 20, 22

*Friedman v. Martinez*,
   231 A.3d 719 (N.J. 2020) ...................................................... 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000) ............................................................ 12

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
   934 F.3d 316 (3d Cir. 2019) .................................................... 20

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
   806 F.3d 125 (3d Cir. 2015) ................................................ 20, 29

*In re Horizon Healthcare Services Inc. Data Breach Litig.*,
   846 F.3d 625 (3d Cir. 2017) ................................................ 10, 21

*In re Horizon Healthcare Services Inc. Data Breach Litigation*,
   846 F.3d 638 (3d Cir. 2017) ............................................................... 21

*Jones v. Bloomingdales.com*,
   124 F.4th 535 (8th Cir. 2024) ....................................... 3, 12, 27, 28, 29

*Jones v. Ford Motor Co.*,
   85 F.4th 570 (9th Cir. 2023) ............................................................. 22

*Laurel Gardens, LLC v. McKenna*,
   948 F.3d 105 (3d Cir. 2020) ............................................................. 10

*Lightoller v. Jetblue Airways Corp.*,
   2023 WL 3963823 (S.D. Cal. June 12, 2023) ..................................... 29

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 12

*Massie v. General Motors LLC*,
   2022 WL 534468 (D. Del. Feb. 17, 2022) .......................................... 30

*Nabozny v. Optio Sols. LLC*,
   84 F.4th 731 (7th Cir. 2023) ....................................................... 19, 27

*In re Nickelodeon Consumer Privacy Litigation*,
   827 F.3d 262 (3d Cir. 2016) ....................................................... 21, 29

*Rhodes v. Graham*,
   37 S.W.2d 46 (Ky. Ct. App. 1931) ..................................................... 23

*Spokeo v. Robins*,
   578 U.S. 330 (2016) .................................................................. 2, 14, 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 338 (2016) ...................................................... 10, 13, 16, 17

*St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*,
   898 F.3d 351 (3d Cir. 2018) ............................................................. 22

*Susinno v. Work Out World Inc.*,
   862 F.3d 346 (3d Cir. 2017) ............................................................. 21

iii

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................ 2, 8, 13, 14, 15, 16, 17, 18, 19, 21

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................ 12

## Other Authorities

Federal Rules of Civil Procedure 12 ...................................................... 7, 8

RESTATEMENT (SECOND) OF TORTS § 652B ............................................... 24

RESTATEMENT (SECOND) OF TORTS § 652D ........................................ 25, 26

## INTRODUCTION

Eight plaintiffs brought this action against two defendants ("BPS"), challenging BPS's use of "session replay" software. Session replay is a ubiquitous tool that companies use to analyze the functionality of their websites and the performance of their advertising campaigns. The plaintiffs alleged that BPS used this software to capture their browsing activities—including their page views, text entries, and clicks—on BPS's retail websites, basspro.com and cabelas.com.

From the start, it was easy to see that the complaint had a dispositive flaw: it did not come close to alleging the concrete harm required for Article III standing. The plaintiffs did not even *claim* that BPS collected any private or sensitive information about them. To the contrary, they disavowed any legal theory that would turn on the specific data that each plaintiff disclosed to BPS. Instead, they argued that they had established standing merely by alleging violations of statutes and common law rules that are generally designed to protect against invasions of privacy.

The district court correctly held that this theory was inconsistent with the Supreme Court's Article III decisions. Those cases require

plaintiffs to demonstrate—"even in the context of a statutory violation"—that they have suffered "the kind of harm" that "bears a close relationship to a harm traditionally recognized by American courts." *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 142, 145 (3d Cir. 2024) (quoting *Spokeo v. Robins*, 578 U.S. 330, 241 (2016), and *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021)). The district court therefore compared the harm that plaintiffs alleged—the collection and disclosure of unspecified browsing data—to the harms protected by the common law torts of intrusion on seclusion and public disclosure of private facts. And it found no close relationship, because plaintiffs did not allege that BPS collected their "private" facts or disclosed their data to the "public."

On appeal, plaintiffs continue to insist that this Court should ignore the particular data that they allegedly sent to BPS. They still have not conducted the comparative analysis required by Supreme Court precedent. And they have once again failed to explain how they could have been harmed by the disclosure of utterly generic browsing activity. As the Eighth Circuit recently concluded—in a case about session replay—it is difficult to "understand how the movements of a cursor or a person's general navigation across a website conveys any information

that a customer could reasonably expect to keep private." *Jones v. Bloomingdales.com*, 124 F.4th 535, 539 (8th Cir. 2024). For that reason and others, the Eighth Circuit "join[ed] the overwhelming number of district courts to hold that plaintiffs lack standing in cases like these." *Id.* This Court should do the same, and affirm.

## STATEMENT OF THE CASE[1]

### A. BPS Uses Session Replay To Improve The Customer Experience On Its Websites.

The two defendants—BPS Direct LLC and Cabela's LLC (collectively, "BPS")—are owners of physical retail stores and websites that sell outdoor products, including hunting gear, firearms, and camping equipment. JA77, 96. BPS hires third-party vendors to create and implement session-replay code on its websites. JA68. Session replay allows companies to capture data points and recreate a visual "play back" of a website visitor's browsing session, thereby helping the companies "improve customer experiences." JA83.

---

[1]    Citations to "OB__" refer to the plaintiffs' opening brief. "JA__" refers to the appendix filed with the plaintiffs' brief. "Dkt. __" refers to entries on the district court's docket that are not in the JA. Because the district court resolved this case at the pleading stage, BPS accepts the complaint's well-pleaded allegations as true for purposes of this appeal.

Specifically, when a customer visits a website with session-replay code, the software captures the customer's page views, text entries, clicks, mouse movements, keystrokes, scrolls, zooms, window resizes, and other forms of navigation. JA88. BPS sends this data to the session-replay vendors, who then use their platforms to arrange the data in a format that is most useful for BPS. JA89. BPS analyzes this data to improve the functionality of its websites and the performance of targeted advertising. JA84, 87. Plaintiffs do not allege that BPS uses the data for any other purpose, nor do they claim that BPS sends session-replay data to third parties other than the vendors. JA68-69.

## B. The Plaintiffs Bring This Lawsuit Without Identifying Any Specific Data That They Allegedly Sent To BPS.

The eight plaintiffs—Brian Calvert, Timothy Durham, Marilyn Hernandez, Greg Moore, Arlie Tucker, Brittany Vonbergen, Heather Cornell, and Peter Montecalvo—are residents of various states who claimed that they used BPS's websites without knowing that BPS was collecting their data using session replay. JA98-107. They brought several overlapping actions against BPS that were consolidated into an MDL in the Eastern District of Pennsylvania. JA1.

Seven of the eight plaintiffs claimed that when they visited BPS's websites, BPS's session-replay code captured their "mouse clicks and movements, keystrokes, search terms, substantive information inputted by [them], pages and content viewed by [them], scroll movement, and copy and paste actions." JA99-100, 102-06. But none of the plaintiffs identified any specific data that was captured by the code:[2]

- Three of the plaintiffs—Moore, Tucker, and Vonbergen—said absolutely nothing about what they browsed on BPS's websites. *See* JA104 ("Moore visited www.basspro.com on his computers and/or mobile devices."); JA105 ("Tucker visited www.basspro.com on his mobile phone and computer."); JA106 ("Vonbergen visited www.cabelas.com on her computer and/or smartphone approximately four times in 2022.").

- One plaintiff—Calvert—alleged that he "browsed for different products for sale and communicated with Cabela's website by using his mouse to hover and click on certain products and typing search words into the search bar." JA98. He did not

---

[2]    One plaintiff—Durham—did not even allege any individual interaction with BPS's website. *Cf.* JA98-107.

identify what "products" he searched for, or what "words" he typed, and he "did not end up purchasing any products on his visits to Cabela's website." JA99.

- One plaintiff—Hernandez—alleged that she "browsed for jackets for sale and communicated with BPS's website by using her mouse to hover and click on certain products and typing search words into the search bar." JA101. Apart from the vague reference to "jackets," Hernandez likewise did not describe the information she entered on the websites, and she, too, "did not end up purchasing any products." *Id.*

- Two plaintiffs—Cornell and Montecalvo—alleged that they made purchases on BPS's websites: respectively, a "Bass Pro Shops Eclipse Mesh-Back Canopy Chair in Cloisonne Blue" (JA100), and a "RedHead Last Chance Light Duty Belt" (JA103). But other than identifying those two items (and their color), the plaintiffs' only description of what they entered into the websites was "name, address, and payment and billing information." JA100, 103. As discussed below, they declined the district court's invitation to explain whether they

disclosed financial data from their bank accounts, credit card

data, or other potentially identifying information.

Based on these allegations, the plaintiffs brought claims under the federal Wiretap Act, the Computer Fraud and Abuse Act, and several state statutes. JA120-42, 146-50, 154-63, 166-70. They also asserted common law claims for invasion of privacy, trespass to chattels, and conversion to chattels. JA143-46, 151-54, 163-66, 170-79. They sought to certify a nationwide class of "[a]ll natural persons in the United States whose Website Communications were captured in the United States through the use of Session Replay Code embedded in Defendants' Websites." JA116.

## C. The District Court Dismisses The Complaint For Lack Of Article III Standing.

BPS moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). JA8-9. As relevant here, BPS argued that the plaintiffs had failed to allege the concrete injury required for Article III standing. JA9. It explained that under the Supreme Court's Article III precedents, the district court had to compare (i) the specific data that BPS allegedly collected from the plaintiffs, with (ii) the kind of information that has been historically protected by the common law

privacy torts. JA11. BPS argued that plaintiffs had failed to establish the necessary "close relationship" between their alleged harm and any historically recognized harms. JA10-11.

Plaintiffs opposed BPS's motion. JA10. They repeatedly argued that it makes no difference what particular information they disclosed to BPS, and that what matters is whether their *causes of action* are generally designed to protect privacy. *See, e.g.*, Dkt. 56 at 2 ("Defendants would have this Court focus its attention on the sensitivity of the content. This is incorrect . . . ."); *id.* at 5 ("Standing to bring suit in [wiretapping] cases has never depended on an allegation that the precise information intercepted is itself private."); *id.* at 6 ("The Wiretapping Statutes . . . codify the long-held notion that the willful interception of a wire, oral, or electronic communication is an illegal act that causes a concrete injury to the person whose communication is intercepted.").

On December 5, 2024, the district court issued a 49-page opinion holding that each plaintiff lacked standing.[3] "Guided by [the] Supreme Court in *TransUnion* and [the] reasoning in session replay decisions

---

[3]    The district court did not reach BPS's Rule 12(b)(6) arguments.

across the country," the district court concluded that BPS's conduct did not "amount[] to an invasion of privacy interests that have been historically protected." JA17. Specifically, the court compared the data at issue with the information protected by two common law privacy torts: intrusion upon seclusion and public disclosure of private facts. JA20. The court found that plaintiffs had not sufficiently alleged either that the data they disclosed was "private," or that BPS had disclosed this data to the "public." JA20. To the contrary, a person's "mouse clicks, keystrokes, pages and content viewed" are analogous to "what [BPS] employees would have been able to observe if Plaintiffs had gone into a brick-and-mortar store and began browsing the inventory." JA20.

The court dismissed the claims of six plaintiffs with prejudice. JA33. It gave plaintiffs Cornell and Montecalvo—the two who claimed that BPS captured their "payment and billing" information—an opportunity to re-plead if they could "truthfully allege [BPS] intercepted and shared highly sensitive personal information such as a medical diagnosis information or financial data from banks or credit cards." JA34. They did not re-plead, and instead informed the district court that they would "stand on the allegations" in the operative complaint. Dkt. 96. The

district court then dismissed their claims with prejudice (JA52), and all of the plaintiffs appealed (JA53).[4]

## STANDARD OF REVIEW

This Court "reviews dismissals for lack of standing *de novo.*" *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009) (quotation marks omitted). "The plaintiff . . . bears the burden of establishing [standing]." *Spokeo,* 578 U.S. at 338. A "complaint must contain sufficient factual matter that would establish standing if accepted as true." *In re Horizon Healthcare Services Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (quotation marks omitted).

## SUMMARY OF ARGUMENT

The district court correctly held that the plaintiffs lack Article III standing because they did not allege any concrete harm.

---

[4]     Plaintiffs suggest that the district court based its decision entirely on the fact that BPS did not collect their "medical diagnosis information or financial data from banks or credit card[s]." OB38 (quoting JA2). But the court did not say that *only* this data would suffice. Almost every time the district court used that phrase, it was preceded by the words "such as"; the list was illustrative, not exclusive. Regardless, this Court can affirm even if it disagrees with that portion of the district court's opinion. *See Laurel Gardens, LLC v. McKenna*, 948 F.3d 105, 116 (3d Cir. 2020).

1.    To establish standing, a plaintiff must allege that he or she suffered "the kind of harm" that "bears a close relationship to a harm traditionally recognized by American courts." *Barclift*, 93 F.4th at 142, 145. In a privacy case, this means that a court must analyze the specific information that the defendant allegedly collected from the plaintiff, and compare it to the types of information that have been protected by the common law privacy torts. Applying these principles, this Court held last year that a privacy plaintiff could establish standing only by alleging a disclosure of "private information"—information that would be "highly offensive" if viewed by the public. *Id.* at 146.

2.    Plaintiffs have not satisfied this standard. First, they have not even claimed that BPS captured their "private" information; apart from a generic list of routine browsing activities (like "mouse clicks," "keystrokes," and "search terms"), plaintiffs have repeatedly disclaimed any need to identify the data they disclosed to BPS. Second, plaintiffs have not alleged that BPS disclosed their information to the "public"; BPS did not share their data with anyone other than the software vendors that were tasked with putting the data in a useful format. Third, plaintiffs have not alleged that BPS used their data in a "highly

offensive" manner; according to their own complaint, BPS uses session-replay data for functionality and advertising purposes that are pervasive on the Internet. For just these reasons, an "overwhelming number" of courts have held that "plaintiffs lack standing in cases like these." *Jones*, 124 F.4th at 539. This Court should affirm.

## ARGUMENT

## I.   The Plaintiffs Had To Allege That They Suffered A Harm Closely Related To The Kind Recognized At Common Law.

### A.   The Supreme Court's Cases Required A Comparative Analysis Of The Specific Information That The Plaintiffs Allegedly Disclosed.

To satisfy the "irreducible constitutional minimum" of Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), a plaintiff must show that he "has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) (quotation marks omitted). When a case is at the pleading stage, the plaintiff must "*clearly*" "allege facts demonstrating" an Article III injury. *Warth v. Seldin*, 422 U.S. 490, 518 (1975) (emphasis added).

In *Spokeo, Inc. v. Robins,* 578 U.S. 338 (2016), the Supreme Court rejected the view that a "plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341. Instead, the Court held, "Article III standing requires a concrete harm even in the context of a statutory violation." *Id.* A concrete harm does not need to be "tangible." *Id.* at 340. But when deciding whether an "intangible" harm is concrete, a court must "consider whether [the] intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. Only those harms can be "elevate[d]" by a legislature "to the status of legally cognizable injuries." *Id.*

The Court further developed these principles in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, a class of plaintiffs sued under the Fair Credit Reporting Act (FCRA), claiming that a credit reporting company had failed to use reasonable procedures to ensure the accuracy of its credit files. *Id.* at 417. The Court first explained that "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of a federal law, and (ii) a

plaintiff's suffering concrete harm because of the defendant's violation." 594 U.S. at 426-27. Regardless of "Congress's say-so," a federal court has the "responsibility to independently decide whether a plaintiff has suffered a concrete harm." *Id.* at 426. And the "[c]entral" question "is whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (quotation marks omitted). "*Spokeo* does not require an *exact* duplicate in American history," but it does require a "*close* historical or common-law analogue." *Id.* at 424-25 (emphases added).

The Court then compared the information in the plaintiffs' credit reports with the available common law analogues. Because of the defendant's failure to abide by FCRA, the plaintiffs' credit files included "alerts that labeled [them] as potential terrorists, drug traffickers, or serious criminals." *Id.* at 432. The Court found that when such a report is sent to a third party, the resulting harm has "a close relationship to . . . the reputational harm associated with the tort of defamation." *Id.* at 433. "Under longstanding American law, a person is injured when a defamatory statement that would subject him to hatred, contempt, or ridicule is published to a third party." *Id.* (quotation marks omitted). The

14

Court therefore held that the "class members whose reports were disseminated to third parties suffered a concrete injury." *Id.* By contrast, the remaining class members—whose reports had not been disclosed— lacked standing: "there is no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *Id.* at 434 (quotation marks omitted).

Before moving on, it is worth addressing three points that plaintiffs make about the Supreme Court's opinions. First, they argue that "neither *Spokeo* nor *TransUnion* held that Article III standing is limited to enforcement of common law claims, or statutory claims that precisely parrot the elements of common law claims." OB18. That is true—again, *Spokeo* requires a "close" "analogue," not "an exact duplicate." *TransUnion*, 594 U.S. at 424-25. In *TransUnion*, for example, the defendant argued that none of the plaintiffs had suffered "a harm with a 'close relationship' to defamation because the [] alerts on the disseminated credit reports were only misleading and not literally false." *Id.* at 433. The Supreme Court disagreed, explaining that the "harm from being labeled a 'potential terrorist' bears a close relationship to the harm from being labeled a 'terrorist.'" *Id.* Even though that statement may not

satisfy an element of defamation, it was still the *kind* of statement that could subject a plaintiff to "hatred, contempt, or ridicule." *Id.* at 432. And of course, the Court could only reach that conclusion by reviewing the information that actually appeared on the credit report—not by taking plaintiffs at their word that the report was "misleading" or "harmful."

Second, plaintiffs quote *Spokeo*'s statement that, "because Congress is well positioned to identify intangible harms *that meet minimum Article III requirements*, its judgment is [] instructive and important." OB19 (emphasis added) (quoting 578 U.S. at 341). The italicized language is critical. "Congress may elevate . . . concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341. But "Congress . . . may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 425-26. And Congress's ability to "elevate" a harm always turns on the "close relationship" test.

Third, plaintiffs suggest that wiretapping claims are somehow immune to the Supreme Court's Article III analysis. They rely primarily on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), which explains that wiretapping statutes "protect the privacy of wire, electronic, and oral

communications" without "distinguish[ing] based on the content of the intercepted conversations." OB41 (quoting 532 U.S. at 526); *see* OB44. Plaintiffs are again missing the "important difference" between requirements of the statutes and the requirements of Article III. *TransUnion*, 594 U.S. at 426-67. When it comes to standing, plaintiffs' argument is exactly backwards: *Because* a wiretapping statute does not require a showing of harm, and *because* it does not draw distinctions based on the content of information, the statute itself is not instructive at all about whether a suing plaintiff has suffered concrete harm. Put differently, when a legislature enacts a wiretapping statute, it normally does not make a "judgment" to "elevate" a "legally cognizable injur[y]." *Spokeo*, 578 U.S. at 341. It chooses to impose liability *regardless* of injury—which is permissible for liability but not for Article III standing.

## B.    This Court's Cases Required The Plaintiffs To Allege A Disclosure Of "Private Information."

Last year, this Court issued an Article III opinion that is even more closely on point. In *Barclift v Keystone Credit Services, LLC*, 93 F.4th 136 (3d Cir. 2024), the plaintiff sued a debt collection agency under the Fair Debt Collection Practices Act. *Id.* at 140. She claimed that, without her consent, the defendant had shared her "name, address, debt balance, and

17

other information about [her] debt" with a third-party vendor used to mail collection notices. *Id.* The plaintiff "alleged that the disclosures had caused her embarrassment and stress, invaded her privacy, and inflicted reputational harm." *Id.* This Court held that she lacked standing. *Id.*

The Court first decided to adopt the interpretation of *TransUnion* known as the "kind-of-harm" test, rather than the "element-for-element" test. *Id.* at 144. Under the latter, "a plaintiff's alleged harm must not lack any element of the comparator tort that was essential to liability at common law." *Id.* By contrast, under the approach the Court adopted, a plaintiff must "show that his alleged injury is similar in *kind* to the harm addressed by a common-law cause of action, but not that it is identical in *degree*." *Id.* Naturally, this requires a court to "examine the kind of harm at issue" and compare it to a "traditionally recognized" harm. *Id.* at 145.

The Court then turned to that comparison. The harm alleged by the plaintiff was the "communication of her personal information a third-party mailing vendor." *Id.* And the most closely analogous tort was "public disclosure of private information." *Id.* The Court explained that the harm from this tort "stems from *both* the offensive character of the information and its disclosure to the public." *Id.* at 146 (emphasis added);

*see also id.* at 145-46 ("The harm caused by this tort is 'the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny'" (quoting *Nabozny v. Optio Sols. LLC*, 84 F.4th 731 (7th Cir. 2023))). "When the communication of personal information only occurs between a debt collector and an intermediary tasked with contacting the consumer, the consumer has not suffered the kind of privacy harm traditionally associated with public disclosure." *Id.* at 146. Even though the plaintiff—unlike the plaintiffs here—"alleged that she was 'embarrassed and 'distressed' by the disclosure," there were "no grounds to believe that the information will result in humiliation," so there was "no comparable harm under *TransUnion*." *Id.* at 146-47.

Tellingly, plaintiffs do not engage at all with *Barclift*'s analysis. Their brief cites *Barclift* just twice, and only to the portion of the opinion adopting the "kind-of-harm" test (OB14, 42)—which does not help them, because the district court did not use the "element" test and we are not using it on appeal. Plaintiffs rely instead on a series of distinguishable Circuit precedents decided before *TransUnion*. OB21-30. These cases are perfectly consistent with our position, but to the extent plaintiffs interpret them otherwise, their reading is untenable after *TransUnion*.

For example, plaintiffs place a lot of weight on two opinions in the same case: *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125 (3d Cir. 2015) ("*Google I*"), and 934 F.3d 316 (3d Cir. 2019) ("*Google II*"). But plaintiffs say almost nothing about the extraordinary facts of those cases. The *Google* plaintiffs alleged that the defendant had deliberately "overrid[den] the plaintiffs' cookie blockers, while concurrently announcing in its Privacy Policy that internet users could 'reset your browser to refuse all cookies.'" 806 F.3d at 150. By doing so, the defendant could "monitor an individual user's web activity over every website on which [it] inject[ed] ads." *Id.* at 131. The Court found that the plaintiffs had standing because (i) they had made "an express, clearly communicated denial of consent for installation of cookies" (which identify users); and (ii) the defendant's "deceit . . . raise[d] different issues than *tracking or disclosure alone.*" *Id.* at 150-51 (emphasis added).[5]

---

[5]    In three parts of their brief, plaintiffs quote *Google II*'s statement that: "History and tradition reinforce that a concrete injury for Article III standing purposes occurs when Google, or any other third party, tracks a person's internet browser activity without authorization. Privacy torts have become well-ensconced in the fabric of American law." 934 F.3d at 325 (quotation marks omitted); *see* OB11, 28, 51. To the extent this dicta suggests that Article III is categorically satisfied in *all* cases where a

Plaintiffs also cite a pair of cases that involved plainly sensitive information. In *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016), this Court found Article III standing where the defendant engaged in "duplicitous tactics": it disclosed *private* information about *children*—including their "birthdate," "gender," "unique device identifiers," "cookie identifiers," and "video materials requested"—despite telling parents that it would not collect "ANY personal information about your kids." *Id.* at 269, 295. In *In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 638 (3d Cir. 2017), the defendant exposed a host of details about more than 800,000 people, including names, birthdates, social security numbers, addresses, demographic information, medical histories, test results, and other care-related information. *Id.* at 629-30. Like in *Barclift*, the Court explained that the common law generally protected "a person's right to prevent the *dissemination* of *private* information" to third-parties. *Id.* at 638 (emphases added). As discussed next, this case is entirely different.[6]

---

party "tracks a person's internet browser activity without authorization," it is inconsistent with the holdings of *TransUnion* and *Barclift*.

[6]    The other cases cited by the plaintiffs (OB24-27, 30-33) are likewise distinguishable. *See Susinno v. Work Out World Inc.*, 862 F.3d 346, 351

II.    **The District Court Correctly Held That The Plaintiffs Did Not Allege Any Concrete Harm.**

Plaintiffs did not allege concrete harm. There is no common law tort that bears a "close relationship" to the collection and disclosure of plaintiffs' session-replay data. Courts around the country have dismissed complaints with similar allegations.

A.    **No Common Law Tort Is Remotely Analogous To The Disclosure Of Plaintiffs' Session Replay Data.**

Plaintiffs argue that their alleged harms are analogous to those recognized under the common law torts of intrusion on seclusion and public disclosure of private facts. OB17-18. But their brief never actually describes the substance of those torts, apart from a few confusing quotes to a random assortment of state law cases. *See, e.g.*, OB43 (citing the

---

(3d Cir. 2017) (plaintiff had standing where she alleged the receipt of an unsolicited phone call, because unwanted phone calls were specifically actionable at common law); *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 354-55 (3d Cir. 2018) (defendant sent debt collection letter prominently displaying information about the plaintiff's debtor status on the outside of the envelope, including his name, his address, his account number, and a QR code that—when scanned by a smartphone—revealed his debt amount); *DiNaples v. MRS BPO, LLC*, 934 F.3d 275, 278-80 (3d Cir. 2019) (similar facts, except that the QR code led to the plaintiff's account number with the debt collection agency); *Jones v. Ford Motor Co.*, 85 F.4th 570, 574 (9th Cir. 2023) (challenge to vehicle "infotainment" system that automatically downloaded call logs and text messages for any cell phone that was connected to the system).

Kentucky Court of Appeals' 1931 decision in *Rhodes v. Graham*, 37 S.W.2d 46, 47 (Ky. Ct. App. 1931), for the proposition that "every man" has a "legal right" "to enjoy social and business relations with his friends, neighbors, and acquaintances . . . without molestation by intruders"); OB44 (citing *Friedman v. Martinez*, 231 A.3d 719, 731-32 (N.J. 2020), for the point that "a victim does not have to present evidence that she was secretly recorded to bring a cause of action for intrusion on seclusion").

It is no surprise that plaintiffs do not engage with the specifics of the torts—after all, they have consistently refused to provide any specifics about the information that was allegedly disclosed. In their view—unlike the Supreme Court's—it is enough for them to allege that BPS violated statutes and common law rules that *generally* protect against "invasions of privacy." *See, e.g.*, OB21 (arguing that "*statutes* that codify or expand upon privacy interests *related in kind* to those recognized at common law satisfy *Spokeo's* standing test" (first emphasis added)); OB27 (arguing that the "cases conclusively establish that alleged privacy invasions confer an Article III injury" regardless of "the *content* of the privacy violation"). Plaintiffs even suggest that "under common law, a presumption of privacy attaches to communications generally, *ab*

*initio.*" OB43. In other words, plaintiffs believe that *all* "communications" are entitled to a broad "presumption of privacy" under the common law.

Not so. Properly defined, the intrusion and public-disclosure privacy torts are not close to comparable. A claim for intrusion on seclusion is available when a defendant "intentionally intrude[s], physically or otherwise, upon the solitude or seclusion of another or his *private affairs or concerns*, if the intrusion would be *highly offensive* to a reasonable person." RESTATEMENT (SECOND) OF TORTS § 652B (emphases added); *see also id.* cmt. b (examples of intrusion on "private concerns" include "opening [someone's] private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents"). The intrusion "must be of the sort that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Cook v. Gamestop*, 689 F. Supp. 3d 58, 72 (W.D. Pa. 2023) (quotation marks omitted) (applying this standard in a case about session replay).

The public disclosure tort is similarly narrow. It applies to a defendant "who gives *publicity* to a matter concerning the *private life* of another . . . if the matter publicized is of a kind that [] would be *highly*

*offensive* to a reasonable person." RESTATEMENT (SECOND) OF TORTS § 652D; *see also id.* cmt. b. ("Sexual relations, for example, are normally entirely private matters, as are family quarrels, [and] many unpleasant or disgraceful or humiliating illnesses . . . ."). "The harm caused by this tort is the humiliation that accompanies the disclosure of sensitive or scandalizing private information." *Barclift*, 93 F.4th at 145-46 (quotation marks omitted).

For at least three reasons, neither tort is analogous here. First, plaintiffs have not alleged that BPS collected information about their "private affairs or concerns" or their "private life." As discussed above (pp. 4-7 *supra*), none of the plaintiffs identified any specific data that was captured by BPS's session-replay code. *See Gamestop*, 689 F. Supp. 3d at 65 ("The requirement of private facts or private affairs in both torts confirms that the nature of the information is paramount."). Six plaintiffs visited BPS's websites anonymously: they did not purchase any items, they did not disclose any information about themselves, and they did not even describe a particular product they searched for. JA98-107. Meanwhile, the two plaintiffs who did allegedly purchase items—Cornell and Montecalvo—only underscored how innocuous their interactions

were. Those plaintiffs alleged that they purchased, respectively, a blue canopy chair and a red belt—which is far from "humiliating"—and that they entered "payment and billing" information. JA100, 103. When the district court gave them a chance to reveal whether this included "sensitive personal information" like bank or credit card data (JA25), they declined to amend their complaints. For all we know, these plaintiffs made their purchases with a gift card or a pre-paid card that was not linked to them.

Second, plaintiffs did not allege that BPS disseminated their information to the "public." When it comes to the disclosure tort, "public" "means that the matter is . . . communicat[ed] to the *public at large*, or to so many persons that the matter must be regarded as substantially certain to become one of *public knowledge*." RESTATEMENT (SECOND) OF TORTS § 652D cmt. a (emphases added). The plaintiffs did not allege that BPS shared their data with anyone other than three session-replay vendors. JA69. Nor did plaintiffs allege any risk that their information would reach additional third parties, much less "the public at large." This case is therefore indistinguishable from *Barclift*, where the plaintiff's information was sent only to a "vendor" tasked with mailing her a

collection notice. 93 F.4th at 139; *see also Nabodny*, 84 F.4th at 736 ("The transmission of information to a single ministerial intermediary does not remotely resemble the publicity element of the [public disclosure] tort.").

Third, plaintiffs have not alleged that BPS used their data in a "highly offensive" manner. To the contrary, their complaint recognizes that session replay has "*legitimate* purposes." JA87 (emphasis added). BPS used the software to improve the functionality of its websites and the effectiveness of its advertising campaigns. JA84, 87. These kinds of activities are ubiquitous—the Internet simply would not function without them. For this reason and others, nearly every court to consider the issue has reached the same conclusion as the district court: that there is nothing "offensive" about the collection and use of session-replay code.

## B. Courts Nationwide Have Overwhelmingly Reached The Same Conclusion As The District Court.

Since plaintiffs filed their brief, two federal appellate courts have dismissed nearly identical suits for lack of standing. In *Jones v. Bloomingdales*, 124 F.4th 535, 537 (8th Cir. 2024), the plaintiffs alleged that two retailers "employed 'session replay' technology" to "record things like [their] 'mouse movements, clicks, keystrokes . . . , search terms, URLs of web pages visited, as well as what [they] searched for, what

[they] looked at, the information [they] inputted, and what [they] clicked on.'" *Id.* at 537 (ellipses omitted). They claimed that the defendants used this data "to improve their websites and to provide targeted advertisements," and "employed the assistance of third parties" to operate the software. *Id.* The plaintiffs asserted the same causes of action as the plaintiffs here, and argued that they had "suffered a harm to [their] privacy" comparable to intrusion upon seclusion. *Id.* at 538-39.

The Eighth Circuit squarely rejected that theory, and quoted with approval the district court's decision in this case:

> Though it is true that the kind of harm to privacy associated with an intrusion upon seclusion can constitute a concrete injury for standing purposes, that doesn't mean that every plaintiff who comes to court alleging such a harm gets in the courthouse door. Federal courts are not much concerned with labels and unsupported characterizations. So even though Jones alleges that the companies invaded her privacy, we do not think her allegations plausibly show that is the case. Jones does not allege, for example, that session-replay technology captured her inputting and then deleting personal information like her social security number, medical history, bank account figures, or credit card information. . . . Most of her allegations concern when this technology is able to capture generally. But as one court aptly explained, "We need to know what session-replay code actually captured, not what session-replay code is capable of capturing." *See In re BPS Direct, LLC*, 705 F. Supp. 23d 333, 356 (E.D. Pa. 2023). . . .
>
> [Plaintiff] mentions that her communications included things like "mouse movements, clicks, [and] keystrokes," but we

Case: 23-3235    Document: 28    Page: 34    Date Filed: 03/10/2025

don't understand how the movements of a cursor or a person's general navigation across a website conveys any information that a customer could reasonably expect to keep private from the website owners themselves. The situation is akin to the commonplace use of a security camera at a brick-and-mortar store to record customers as they shop . . . . But no reasonable customer at a brick-and-mortar store could claim a privacy interest in her general movements and activities in the public parts of that store. We therefore join the overwhelming number of district courts to hold that plaintiffs lack standing in cases like these where they don't allege the interception of private information.

*Id.* at 539 (citation omitted).

As the Eighth Circuit concluded, its decision was in good company. *See, e.g.*, *Daghaly v. Bloomingdales.com, LLC*, 2024 WL 5134350, at *2 (9th Cir. Dec. 17, 2024) (holding that a plaintiff lacked standing to challenge the defendant's session-replay technology under a California wiretapping statute, even though that statute "codif[ied] a substantive right to privacy," because her "allegations about her own interactions with the [defendant's] website [were] sparse"); *Gamestop*, 689 F. Supp. 3d at 66 ("Product preference information is not personal information. This information is no different from what GameStop employees would have been able to observe if Ms. Cook had gone into a brick-and-mortar store and began browsing the inventory."); *id.* at 67 (distinguishing *Google* and *Nickelodeon*); *Lightoller v. Jetblue Airways Corp.*, 2023 WL

3963823, at *4 n.3 (S.D. Cal. June 12, 2023) ("Plaintiff does not allege that she personally disclosed any 'highly sensitive information' during her website visit that was captured by Session Replay Code."); *Massie v. General Motors LLC*, 2022 WL 534468, at *3 (D. Del. Feb. 17, 2022) ("Plaintiffs do not allege that any of their information collected by the Session Replay software was personal or private within the common law understanding of a privacy right."); *Arndt v. Gov't Emps. Ins. Co.*, 2024 WL 4335644, at *5 (D. Md. Sept. 26, 2024) (collecting additional cases).

The Court should join the great weight of authority. The data that BPS collected from plaintiffs is not comparable (let alone closely comparable) to the information protected from disclosure at common law. The plaintiffs lack standing and their complaint was correctly dismissed.

## CONCLUSION

This Court should affirm the decision below.

Dated:  March 10, 2025                Respectfully submitted,

/s/  Michael Rayfield

Michael Rayfield
SHOOK, HARDY & BACON LLP
1 Rockefeller Plaza, Ste. 2801
New York, NY 10020
(212) 989-8844
mrayfield@shb.com

Jennifer McLoone
SHOOK, HARDY & BACON LLP
201 South Biscayne Blvd., Ste. 3200
Miami, Fl 33131
(305) 358-5171
jmcloone@shb.com

Maveric Ray Searle
SHOOK, HARDY & BACON LLP
111 S. Wacker Drive, Ste. 4700
Chicago, IL 60606
(312) 704-7700
msearle@shb.com

*Counsel for Appellees*

# CERTIFICATIONS

I, Michael Rayfield, certify as follows:

**1.** Pursuant to Rule 46.1 of this Court's Local Appellate Rules, I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

**2.** Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c), I certify that this brief complies with the type and volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(b) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 6,240 words and is written in Century Schoolbook, a proportionally-spaced 14-point serif font.

**3.** Today, March 10, 2025, I filed this brief with the Clerk of this Court via the Court's CM/ECF system, which will cause service on counsel for all parties of record who are registered CM/ECF users.

**4.** I further certify that the E-Brief was scanned for computer viruses using Crowdstrike Falcon Sensor v.7.21.19205.0, and no virus was detected.

**5.** I certify that the electronically filed version of the brief and the paper copies sent to the Court are identical.

*/s/  Michael Rayfield*

Michael Rayfield
SHOOK, HARDY & BACON LLP
1 Rockefeller Plaza, Ste. 2801
New York, NY 10020
(212) 989-8844
mrayfield@shb.com

*Counsel for Appellees*

Dated:  March 10, 2025